UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Tony and Mii's, Inc.,<br>Tony Thangsongcharoen, and<br>Somnuek Thangsongcharoen,<br><br>**Plaintiffs**   v.<br><br>The United States of America,<br><br>**Defendant** | § § § § § § § § § § § | <br><br><br><br><br>CIVIL CAUSE NO. 3:17-cv-0609-B<br><br>Jury Trial Demanded |

**Plaintiffs' First Amended Complaint**

Tony and Mii's, Inc. (a.k.a Mii's, Inc. or Mii's Bridal Salon; referred to herein as "Mii's"), Tony Thangsongcharoen, and Somnuek Thangsongcharoen, by and through their undersigned counsel, file this Original Complaint against the United States of America ("Defendant"), and allege as follows:

**Summary Overview**

1.  This is an action under 26 U.S.C. §§ 7433 and 7426 for damages resulting from the reckless, intentional, and/or negligent disregard of the Internal Revenue Code (I.R.C.) and governing Regulations by officers, agents and/or employees of the Internal Revenue Service ("IRS").

2.  Following a directive from a supervisory IRS officer to "shut down this failing business [Mii's]," IRS agents wrongfully classified a stock of more than 1,600 designer bridal gowns as "perishable goods" and invoked a streamlined seizure and sale process designed for perishable goods—not designer dresses—in order to avoid complying with statutorily-prescribed safeguards (like posting public notice and waiting a required period of time) that normally govern such sales. Despite the fact that IRS agents had initially performed a physical inspection of the

inventory, valuing it at over $615,000 (and documenting a possible value above $1 million) and characterizing the entire stock as in "new and . . . good condition," IRS agents subsequently engaged in a bad faith effort to lower its value for internal purposes to $6,000 (less than 1% of the IRS's initially documented valuation), in order to support its decision to institute a perishable goods procedure.

3. Armed agents then seized the inventory from Mii's owners, an elderly and feeble immigrant couple from Thailand, and sold and liquidated the entire stock within four hours. The lead agent brought four children to join the armed agents and tag along during the entire process. Remarkably, seizing agents bid on and purchased property during the sale. They also knowingly seized a war veteran's uniform hat that did not belong to Mii's and numerous items that were clearly outside of the scope of the items in the wrongfully obtained order granting entry onto the premises. Unfortunately, the small tax debt at issue turned out not to even be owed in the first place. And shortly after the traumatic incident, and as a direct result thereof, Tony, Mii's president, was forced to undergo a quadruple bypass surgery, effectively ending his ability to lead Mii's into recovery. The couple, Tony and Somnuek, were left destitute—everything that they had built since immigrating to the United States and beginning their business in 1983 wiped out before their very eyes.

4. Under 26 U.S.C. § 7433, if any officer or employee of the IRS recklessly or intentionally, or by reason of negligence, disregards any provision or regulation under Title 26 in connection with the collection of federal tax with respect to a taxpayer, such taxpayer may bring a civil action for damages against the United States.

5. Under 26 U.S.C. § 7426, if the IRS wrongfully levied on property or wrongfully sold property pursuant to a levy, any person claiming an interest in such property may bring a civil action against the United States.

## The Parties

6. Mii's is a Texas corporation with its principal place of business currently located at 2110 Meadow Glen Drive, Garland, Texas 75044.

7. Tony Thangsongcharoen is an individual currently residing at 2110 Meadow Glen Drive, Garland, Texas 75044. Tony was and is a shareholder of Mii's.

8. Somnuek Thangsongcharoen is an individual currently residing at 2110 Meadow Glen Drive, Garland, Texas 75044. Somnuek was and is a shareholder of Mii's.

9. Defendant is the United States of America and may be served by delivering a copy this Original Complaint and the Summons to John R. Parker, United States Attorney for the Northern District of Texas, 1100 Commerce Street, Third Floor, Dallas, Texas 75242-1699; and by mailing two copies of this Original Complaint and the Summons by certified mail to Jeff Sessions, Attorney General of the United States, at U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

## Jurisdiction and Venue

10. This Court has jurisdiction pursuant to 26 U.S.C. § 7433, 28 U.S.C. § 1340, 28 U.S.C. § 1346, 26 U.S.C. § 7426, and 26 C.F.R. § 301.7433-1.

11. On February 7, 2017, Mii's filed an Administrative Claim for Relief from Unlawful Collection with the IRS pursuant to 26 U.S.C. § 7433 and Treas. Reg. § 301.7433-1. (Exh. A, filed herein without the voluminous and sensitive exhibits thereto)  That Administrative Claim is hereby incorporated for all purposes in this Complaint.

12. On February 7, 2017, Tony and Somnuek filed an Administrative Claim for Relief from Unlawful Collection with the IRS and subsequently filed a Supplemental Administrative Claim for Relief.  (Exh. B, filed herein without the voluminous and sensitive exhibits thereto). That Administrative Claim is hereby incorporated for all purposes in this Complaint.

13. Because the Administrative Claims were filed within six months of the expiration of the period under Treas. Reg. § 301.7433-1(g), this complaint is timely and ripe pursuant to Treas. Reg. § 301.7433-1(d)(2).

14. Venue is proper under 28 U.S.C. §§ 1402 and 1391.  Mii's principal place of business is and was in the Northern District of Texas and Tony and Somnuek reside in the Northern District of Texas.   The property that is the subject of this action is and was situated in the Northern District of Texas, and the acts or omissions complained of occurred in the Northern District of Texas.

## Mii's Claims Under 26 U.S.C. § 7433

15. This is a civil action against Defendant for the unlawful seizure and selling of Mii's property, and for the resulting damages pursuant to 26 U.S.C. § 7433(b) and such other amounts as in law and fact are recoverable. IRS employees, through intentional, reckless, or negligent disregard of the provisions of the IRC and Regulations, caused damages to Mii's due to their unlawful classification of assets as "perishable goods" and their seizure and sale of assets.

16. Mii's allegedly owed the IRS $31,422.46 related to the tax years of 2005, 2008, and 2010.

17. Throughout the period at issue, Mii's was owned and operated by Tony and Somnuek, an elderly, immigrant couple of Thai ethnicity.  Mii's operated a retail boutique bridal store, specializing in selling bridal gowns, bridesmaids' dresses, mother of the bride dresses, flower girl dresses, bridal veils, tiaras, pillows, and prom dresses.  Mii's inventory was entirely paid for, and, in effect, was the life savings of Mii's owners.

18. The inventory at issue—over 1,600 designer bridal gowns and a large amount of related wear—had a value in excess of $615,000.  Mii's carried dresses from designers such as Maggie Sottero, Allure, Mori Lee and others.

19. On March 4, 2015, the IRS wrongfully seized Mii's entire inventory and sold it within four hours without posting public notice, waiting the required period of time, or otherwise complying with I.R.C. § 6335.  The IRS, in disregard of I.R.C § 6335 and § 6336, claimed it was conducting a "perishable goods" seizure and sale, purporting to classify the designer bridal gowns and all other inventory as "perishable goods" in order to avoid complying with the statutorily-prescribed safeguards that govern the sale of seized assets and that are designed to ensure that such sales result in a fair price under the conditions.  The seized inventory did not constitute "perishable goods."

20. Generally, the procedure for conducting a sale of seized assets is to post a public notice of sale, wait at least 10 days after the public notice is posted, and then to conduct the sale in accordance with 26 U.S.C. § 6335 after the waiting period passes. 26 U.S.C. § 6335. The purpose of the statutory waiting period is to ensure that an owner receives a fair price for the

seized property; the waiting period also provides the owner with a period to secure the funds to pay for the property.

21. However, the IRC provides a separate, seldom-used process for the sale of "perishable goods." The perishable goods procedure is available where the property seized is liable to perish, greatly diminish in value by keeping, or cannot be kept without great expense. 26 U.S.C. § 6336. Under the perishable goods procedure, the Service must appraise the property and provide the taxpayer with a notice of the appraised value of the property, and allow the taxpayer a reasonable opportunity to pay such amount or give a bond to satisfy the amount. *Id.* If the taxpayer does not do so—and *if* the IRS has validly invoked the perishable goods procedure—the IRS may conduct a public sale of the property in accordance with the governing law and regulations without waiting the period required under § 6335 or otherwise complying with certain requirements thereunder. *Id.*

22. IRS agents intentionally, recklessly, or negligently mis-valued Mii's assets in an attempt to justify classifying the bridal inventory as "perishable goods" and to internally justify using the "perishable goods" sale provisions under 26 U.S.C. § 6336. No appraisal was actually performed, and the valuation was conducted in bad faith, arbitrarily and without due process, and deliberately to value the inventory at an amount that the IRS agents took the position would—*if* it was a true report of the value—support the use of a "perishable goods" seizure and sale. More precisely, the agents took the position that if they could justify a value lower than the projected cost to store the inventory long enough to comply with the requirements of § 6335 (e.g., the ten-day requirement), then they could justify using the perishable goods procedure—apparently because they believed this would indicate that the goods could not be stored without "great expense."

23. Prior to the seizure and prior to deciding to attempt to justify the use of a perishable goods sale, the IRS conducted a physical inventory, detailing, documenting, and concluding that the inventory had a value in excess of $615,000.  In internal IRS documents and again before deciding to use the perishable goods procedure, the lead seizing agent (who conducted the IRS's physical inventory) described the assets at issue as "in retail sell condition," and further stated in her reports that "all of the dresses and accessories for retail sale are new and are in good condition."

24. Because of this, early on the agent reported and recognized that any seizure to satisfy the putative liability of $31,422 would not require seizing all of the inventory.  As the agent initially reported internally, Mii's "entire inventory will not be seized at the end of the day" because its value greatly exceeded that necessary to satisfy the purported debt.

25. However, the agent subsequently began to feel pressure and an internal decision was made to use the perishable goods procedure.  For example, as documented by internal correspondence, her boss gave her an unmistakable directive, instructing her "***to shut down this failing business venture***."  The agents also decided, as documented, that a perishable goods sale was the "resolution <u>where the government will benefit the most</u>."  That, of course, is not an appropriate criterion for invoking the procedure.  As a result, the revenue officer and other IRS agents began to seek to invoke a perishable goods procedure.  In order to do so, they felt that they would need to somehow document that the inventory was worth dramatically less than they initially determined and reported.  It is not clear whether the conspiring agents' efforts were ethnically motivated or motivated by other prejudice.

26. After initially valuing the inventory at over $615,000, the IRS agent took steps to deliberately justify de-valuing those assets—ultimately all the way down to an official value of

$6,000 for internal purposes (less than $4 per dress and less than 1% of the IRS's initial valuation before it decided to attempt to use a perishable goods procedure). It is no coincidence that this figure was just a few hundred dollars below the value that the agents took the position was necessary to "justify" invoking the perishable goods procedure and effectively put Miis out of business. Leveraging a bad-faith valuation, the IRS agents ultimately wrongfully classified the bridal dress inventory as "perishable goods," then liquidated those assets at a wrongfully conducted sale (at which the seizing agents purchased assets) for roughly $17,000. As internal documents showed, the agents repeatedly took steps to justify lowering the internally-documented "value" of the inventory, progressively and arbitrarily lowering the value from over $615,000 down to $90,000, then to $35,000, then to $21,000, then to $10,000, then ultimately to $6,000 (the "magic" figure that the agents took the position was a few hundred dollars below the amount necessary to justify invoking the perishable good procedures).

27. On the morning of March 4, 2015, a unit of 20-plus government agents armed with firearms overtook the premises and wrongfully seized Mii's entire inventory. The armed agents presented Mii's owners with a written notice on the day of the seizure and sale, informing them that they had approximately two hours to provide a check for $10,000 or the items would be sold. Among the items wrongfully taken during the seizure was an armed services uniform hat that was owned by a Vietnam veteran who had left the hat for Miis to sew badges of honor onto it. The agents nonetheless refused to return the hat to the veteran. Along with the cadre of armed agents, the lead revenue officer brought along four children and set them on a pallet with several boxes of pepperoni pizza to observe the entire process. These highly unusual circumstances demonstrate the complete lack of regard for the exceptional use (and misuse) of the seizure and sale provisions.

28. Within four hours of the seizure and without properly posting notice and waiting the required period, the IRS conducted a wrongful sale of the seized assets by conducting an auction inside of Mii's premises. In doing so, the IRS failed to comply with the notice requirements of Treas. Reg. § 301.6336-1(c). The Service also failed to conduct a public auction in compliance with Treas. Reg. § 301.6336-1(c). The IRS failed to comply with I.R.C. §§ 6335 and 6336. Every last piece of inventory was put into lots and sold—some to government agents.

29. The seizure and sale resulted in the seizure of more than $615,000 of assets and their sale *on the same day* for about $17,000. The IRS agents, unfortunately, followed their instructions to a "t"—they proved successful in shutting down this business, a business that was founded, built, and run by a law-abiding, tax-paying immigrant family from Thailand. The agents auctioned off, before their very eyes, the family's entire life savings for pennies on the dollar. Remarkably, one of the government agents purchased auctioned items (at substantially below market value).

30. The stress of these events caused Mii's president and founder to undergo a life-saving quadruple bypass surgery, resulting in hundreds of thousands of dollars in medical bills and further harm to the business, ultimately making its recovery impossible.

31. Moreover, as it turned out, the purported tax at issue *was not even owed* in the first place and IRS documents demonstrate that the Revenue Officer in charge of the seizure was well aware that the assessed balance was incorrect and due to a system error, and had been in communication with the taxpayer's tax representative over the issue. In fact, the taxpayer's tax returns on file with the IRS reflect that the tax year at issue *generated a net operating loss carryover*, not a taxable amount.

32. These actions were not reasonable, in compliance with the governing laws or regulations, or pursuant to an accurate or justifiable valuation. Among other violations, the seizing agents

failed to comply with I.R.C. § 6331(d)(2)'s 30-day notice requirement; issued the levy in the name of the wrong person; and failed to comply with § 6331(d)(4)'s requirement to provide notice of the relevant provisions of the IRC relating to the levy (e.g., § 6336), the procedures applicable to the levy and sale, the alternatives available to prevent levy and other requirements of § 6331(d)(4).  The agents also violated, among other provisions, I.R.C. § 6331(f) and (j) by conducting an uneconomical levy (and failing to conduct an uneconomical levy analysis required by § 6331(j)) and by failing to conduct the required investigation of the property and to consider alternative collection methods.

33. Had the IRS used its original inventory value (over $615,00), the IRS would have had no potential basis to conduct a perishable goods seizure and sale.  It would have been required to conduct a normal seizure and sale under I.R.C. § 6335, requiring notice and compliance with other Congressionally required safeguards.  Even if the IRS had used its subsequent arbitrarily discounted valuations (of $90,000, then $35,000, then $21,000, then $10,000) it would <u>not</u> have had any potential basis to treat the inventory as perishable goods under any theory, and would have been required to conduct the sale under 26 U.S.C. § 6335.  And, as explained below, even under the agents' flawed theory, the $6,000 figure that it ultimately manufactured would not have allowed the IRS to conduct a perishable goods seizure and sale.  The entire process was unlawful.

34. By intentionally manufacturing a "value" less than the purported cost to conduct a proper seizure and sale, the agents wrongfully took the position that they could justify invoking the exceptional perishable good procedure. (Had they determined a value of even $620 more, the agents would not have had a basis to invoke the perishable goods procedure even under their flawed theory.)  Thus, the $6,000 figure was something of a "magic" figure for them.  Moreover,

internal IRS files demonstrate that the IRS agents also manufactured and falsified the cost figures that they used to justify invoking the procedure—the quoted costs were actually substantially less than even the $6,000 figure (nearly half), and thus, even under their flawed theory, the $6,000 figure would not have allowed the agents to invoke the perishable goods seizure.

35. Moreover, IRS records demonstrate that as late as March 2, 2015 (two days before the seizure), the revenue agent's higher ups were backtracking and refusing to approve the perishable goods procedure, citing concerns about the inventory and its value, as well as the cost to store it.  Electronic time stamps even reflect that the revenue agent's management did not sign off on the perishable goods procedures until *after* she had submitted an affidavit and obtained a writ from the district court to conduct the seizure.  Based on the foregoing, the revenue agent potentially made a number of significant misrepresentations to the district court that issued the order for Entry on Premises to Effect Levy.  Internal IRS records also demonstrate that two days before the seizure the revenue agent made last-minute changes to the seizure memo in order to support the perishable goods procedure in order to obtain approval (or as part of an effort to cover up), providing new descriptions of the inventory as "lower quality and cost dresses" that would not be "marketed to individual buyers."  These last-minute description changes stood in stark contrast to her prior descriptions that the inventory was "in retail sell condition," and that "all of the dresses and accessories for retail sale are new and are in good condition."  (Moreover, under the public sale provision, the IRS must market to all potential buyers; it cannot exclude a particular segment of the market for its convenience or otherwise.)

36. As demonstrated by the foregoing, the IRS intentionally, recklessly, and/or negligently violated the IRC and Regulations and harmed Mii's and its owners.

37. Moreover, the IRS also operated outside the scope of the district court's Order for Entry on Premises to Effect Levy by seizing and selling property that did not belong to Mii's. The Order for Entry described the property to be seized as including "wedding dresses, bridesmaid dresses, prom dresses, shoes, bridal, veils, pillows, miscellaneous furniture, cash register, sewing machine and a pressing machine." However, during the seizure, in addition to the more than $615,000 worth of wedding dresses and related inventory, the following property was seized and sold by the IRS: Keuring K40 Elite and K-cup carousel; Onkyo HT53500(B) surround sound music system; HPM 476DN Laser Jet Multi Functional printer; Nintendo Wii Mario Kart 8 Deluxe set; XBOX 1 Assassin Creed Unity Bundle; Sony PlayStation 4, 2 game bundle Grand Theft Auto 5 & The Last of Us, serial number MB319365746, 500GB; 13 in 1 Combo Game Table; and LG 65 inch Ultra HD TV, serial #410RMXX2S730, model 65UB9500. None of these items fall into the scope of the authorized seizure of property and none were ever justified for perishable goods treatment. Indeed some of the items were not even the property of Mii's, and the IRS agents were informed of and aware of this at the time they seized the assets.

38. Tony and Somnuek individually and specifically owned the sewing machines, pressing machines, printer, air compressor, furniture, other tools and equipment, and Keurig machine that were wrongfully seized. Their family, including Tony and Somnuek, jointly owned the other items listed in the third sentence of paragraph 37 above.

39. One of the seizing agents purchased assets at the auction. The agents then took steps to hide this by falsely certifying that another purchaser, Refresh Bridal, LLC, purchased the items. These steps were just a few of the many throughout the process designed to cover up the IRS agents' intentional disregard of the governing statutes and regulations.

40. As set forth in the foregoing paragraphs, the IRS intentionally, recklessly, and/or negligently undervalued (internally) Mii's inventory and seized all the inventory and items in order to wrongfully hold a perishable goods sale, and sold the inventory at an extremely discounted rate in disregard and violation of the governing seizure and sale rules (e.g., under § 6335 and the regulations thereunder), all to the detriment of Mii's and its owners.

41. Mii's was completely put out of business and never recovered.  It has suffered economic damages in excess of $1,000,000 due to the IRS's intentional, reckless, or negligent collections and illegal sale of the seized goods.

42. Mii's seeks $1,000,000 in economic damages for the wrongful acts with respect to its inventory.  The acts resulted in losses in excess of $615,000 with respect to its inventory, and over $500,000 with respect to its ongoing business.

43. Mii's seeks $7,834 in damages for the replacement costs of the property seized outside the scope of the Notice of Seizure and subsequently sold.

44. Mii's seeks loss of reputation damages of $500,000. The unlawful seizure and sale caused Mii's reputation irreparable harm.

45. Finally, Mii's seeks damages of $300,000 in economic damages that resulted from health complications caused by the unlawful actions of the IRS. Tony, Mii's president, suffered a heart attack requiring quadruple bypass surgery as a result of the stressful experience during and after the unlawful seizure and the sale of all of Mii's inventory.  This resulted in medical bills in excess of $300,000 and further damages to its business, as Mii's lost its head executive and was never able to recover.

46. Under 26 U.S.C. § 7433, Mii's is entitled to direct economic damages in the amount of $1,000,000 because the actual, direct economic damages exceed $1,000,000.

### Tony's Claims Under 26 U.S.C. § 7426(h)

47. Tony repeats and realleges each and every allegation set forth in paragraphs 1-46, inclusive, and incorporates them herein by reference.

48. Tony has suffered economic damages in excess of $1,000,000 due to the IRS's intentional, reckless, or negligent collections and illegal sale of seized goods, some of which he had a personal interest in, including those items detailed in paragraph 38.  Such damages for the items that he had a direct interest in are not believed to exceed $50,000 in and of themselves; however, because he suffered *some* damages compensable under I.R.C. § 7426(h) and because there was reckless, intentional or negligent disregard of applicable provisions by IRS officers, as described above, the total damages that he suffered as a proximate result of those violations (and that is, therefore, compensable within the scope of § 7426(h), subject to its $1,000,000 cap) exceeded $1,000,000.

49. Tony seeks $1,000,000 in economic damages for the wrongful collection actions.  The IRS's wrongful actions caused his interest in Mii's (e.g., his stock interest) to decrease in value by more than $1,000,000.  He also suffered damages directly related to items that he had a personal interest in, as detailed in paragraphs 37 and 38.

50. Finally, Tony seeks damages of $300,000 for emotional distress and economic damages that resulted from health complications caused by the IRS's unlawful actions. Tony suffered a heart attack requiring quadruple bypass surgery as a result of the stressful experience during and after the unlawful seizure and the sale of all of Mii's inventory.  This resulted in medical bills in excess of $300,000 and caused further damage to Mii's ability to recover, and thus to the value of his interest in Mii's and the inventory.

51. Under 26 U.S.C. § 7426(h), Tony is entitled to direct economic damages from the IRS in the amount of $1,000,000 because the actual, direct economic damages exceed $1,000,000.

### Somnuek's Claims Under 26 U.S.C. § 7426(h)

52. Somnuek repeats and realleges each and every allegation set forth in paragraphs 1-46, inclusive, and incorporates them herein by reference.

53. Somnuek has suffered economic damages in excess of $1,000,000 due to the IRS's intentional, reckless, or negligent collections and illegal sale of seized goods, some of which she had a personal interest in, including those items detailed in paragraph 38.  Such damages for the items that she had a direct interest in are not believed to exceed $50,000 in and of themselves; however, because she suffered *some* damages compensable under I.R.C. § 7426(h) and because there was reckless, intentional or negligent disregard of applicable provisions by IRS officers, as described above, the total damages that she suffered as a proximate result of those violations (and that is, therefore, compensable within the scope of § 7426(h), subject to its $1,000,000 cap) exceeded $1,000,000.

54. Somnuek seeks $1,000,000 in economic damages for the wrongful collection actions. The IRS's wrongful actions caused her interest in Mii's (e.g., her stock interest) to decrease in value by more than $1,000,000.  She also suffered damages directly related to items that she had a personal interest in, as detailed in paragraphs 37 and 38.

55. Finally, Somnuek seeks damages of $300,000 for emotional distress and economic damages that resulted from health complications caused by the unlawful actions of the IRS. Tony suffered a heart attack requiring quadruple bypass surgery as a result of the stressful experience during and after the unlawful seizure and the sale of all of Mii's inventory.  This resulted in

medical bills in excess of $300,000 and caused further damage to Mii's ability to recover, and thus to the value of her interest in Mii's and the inventory.

56. Under 26 U.S.C. § 7426(h), Somnuek is entitled to direct economic damages from the IRS in the amount of $1,000,000 because the actual, direct economic damages exceed $1,000,000.

## The Plaintiffs' Claims Under 26 U.S.C. § 7430

57. The Plaintiffs reallege each allegation heretofore made.

58. The IRS has acted in each of the actions set forth above without substantial justification and each of the Plaintiffs is entitled to attorney's fees pursuant to 26 U.S.C. § 7430.

## Prayer For Relief

WHEREFORE, the Plaintiffs prays for judgment against Defendant for all amounts set forth in this Complaint with interest thereon and such other and further relief as may be just.

Respectfully submitted,

By: /s/ Jason Freeman
Jason B. Freeman
TX Bar # 24069736

Freeman Law, PLLC
2595 Dallas Parkway, Suite 420
Frisco, Texas 75034
Telephone: 214.984.3410
Fax: 214.984.3409
Jason@freemanlaw-pllc.com

**ATTORNEY FOR PLAINTIFFS**