

2595 DALLAS PARKWAY, SUITE 420 · FRISCO, TX 75034
PHONE (214) 984-3410 · TOLL FREE (855) 676-1040 · FAX (214) 984-3409
WWW.FREEMANLAW-PLLC.COM

Jason B. Freeman                                      Jason@FreemanLaw-pllc.com
Managing Member

February 7, 2017

Via Certified Mail Return Receipt Requested: 7016 1970 0000 4659 5901
and Fax: (877) 477-9223

IRS Advisory Group
1100 Commerce St.
Mail Code 5028 DAL
Dallas, Texas 75242

Attn: Compliance Technical Support Manager
Area Director
Internal Revenue Service
1100 Commerce St.
Dallas, TX 75242

RE:  Tony ("Thawatchai") Thangsongcharoen and Somnuek Thangsongcharoen
     ("Taxpayer" or "Taxpayers")
     SSN: ▮▮▮▮▮▮ and ▮▮▮▮▮▮ respectively
     Request for Relief from Unlawful Collection Pursuant to 26 U.S.C. § 7433,
     Regulation § 301.7433-1

     We hereby request relief pursuant to 26 U.S.C. § 7433 and the regulations
thereunder as set forth in the enclosed Administrative Claim for Relief.

                                   Sincerely,

                                   Jason B. Freeman



EXHIBIT
B

**Administrative Claim for Relief Pursuant to 26 U.S.C. § 7433**

Via Certified Mail Return Receipt Requested: 7016 1970 0000 4659 5901
and Fax: (877) 477-9223

IRS Advisory Group
1100 Commerce St.
Mail Code 5028 DAL
Dallas, Texas 75242

Attn: Compliance Technical Support Manager
Area Director
Internal Revenue Service
1100 Commerce St.
Dallas, TX 75242

RE:   Tony ("Thawatchai") Thangsongcharoen and Somnuek Thangsongcharoen
("Taxpayer" or "Taxpayers")[1]
SSN: ██████ and ██████ respectively
Request for Relief from Unlawful Collection Pursuant to 26 U.S.C. § 7433,
Regulation § 301.7433-1

Dear Sir or Madam:

Pursuant to 26 U.S.C. § 7433, Taxpayers hereby request that relief in the form of damages described below be granted related to the unlawful collection actions that occurred on March 4, 2015 (and all actions related thereto) as a result of the reckless, intentional, and/or negligent disregard of the Internal Revenue Code and governing Regulations.[2]

<u>Statement of Taxpayer Identification</u>

1. Tony Thangsongcharoen's Tax Identification Number is ██████   Somnuek Thangsongcharoen's Tax Identification Number is ██████ Tony Thangsongcharoen and Somnuek Thangsongcharoen are collectively referred to herein as Taxpayer. The taxpayer's current address is 2110 Meadow Glen Dr., Garland, TX 75044. The taxpayer's current home and work phone number is (214) 517-4754. For current contact purposes, Taxpayer is currently using the phone number and address of their attorney: The mailing address is 2595 Dallas Parkway, Suite 420, Frisco, TX 75034, and the telephone number is (214) 984-3410. Taxpayer can be contacted between 8:00 AM and 5:00 PM any day of the week.

---

[1] This claim is related to an administrative claim submitted on behalf of Tony & Mii's, Inc. (TI██████). While correspondence from the IRS refers to Tony & Mii's, Inc. as Mii's Inc. d/b/a Mii's Bridal Salon, its legal name is Tony and Mii's, Inc. For sake of clarity, however, such entity will be referred to as Mii's or Mii's Inc. herein.

[2] This administrative claim is being filed with the above-listed addressee/address pursuant to Notice 2010-53 and IRS Publication 4235. It is also addressed according to Treas. Reg. 301.7433-1 (i.e., addressed to the Area Director attention of the Compliance Technical Support Manager). Although such latter procedure has been superseded by the requirements of Notice 2010-53, and the referenced position has been abolished, Treas. Reg. § 301.7433-1 has not been withdrawn or amended.

Statement of Claim[3]

2.   This is an administrative claim against the Internal Revenue Service ("IRS") for unlawfully seizing, collecting, and selling Mii's property and for the resulting damages pursuant to 26 U.S.C. § 7433(b) and such other amounts as in law and fact are suffered, and recoverable, by Taxpayers. IRS agents, through intentional, reckless, and/or negligent disregard of the provisions of the Internal Revenue Code ("IRC") and Regulations, caused damages to Taxpayer's due to their unlawful seizure, collection, and sale of assets of Mii's, an entity owned by Taxpayers and whose value decreased substantially as a result of the unlawful actions thereby causing damages to Taxpayers.   The assets at issue—over 1,600 designer bridal gowns and a large amount of related wear—had a value of over $615,000.   Indeed, the IRS had conducted a physical inventory supporting a value in excess of $600,000 prior to the seizure. (Exh. A)[4]  (*See also* Exh. B - The values provided by the revenue officer on Exh. B, dated January 29, 2015, reflect that the inventory had a lowest possible value of $365,000 and an estimated potential value in excess of $1,000,000.)[5] Nonetheless, the IRS classified the designer bridal gowns as "perishable goods" and instituted a seizure under the guise of a "Perishable Goods" procedure, taking the position that the bridal gowns were perishable goods for such purposes and conducting a sale of the seized assets within four hours of their seizure.   <u>One of the seizing agents purchased seized assets.</u>

3.   After initially valuing the assets at over $600,000, the IRS agent took steps to deliberately justify de-valuing the assets, which included more than 1,600 designer bridal dresses, to $6,000 for internal purposes—a figure that the agents believed was just below the value necessary to purportedly "justify" invoking the perishable goods procedure (and thereby circumvent the normal seizure and sale rules).[6] The seizure and sale resulted in the seizure of more than $615,000 of assets and their sale <u>*on the same day*</u> for about $17,000.   The seizure was conducted in bad faith, as summarized through correspondence among the agents documented in the administrative file—for example, the following directive from the IRS Supervisory Revenue Officer: "don't miss the opportunity <u>*to shut down this failing business venture.*</u>" (Exh. C, referring to the perishable goods seizure) The IRS was, unfortunately, successful in shutting down this business—a business that was founded, built, and run by a law-abiding, tax-paying immigrant family from Thailand.   It was

---

[3] In support of its claim, Taxpayer relies upon all documents referenced as exhibits, as well as all documents in the IRS's administrative file (including all documents received pursuant to Mii's FOIA request, which is hereby incorporated by reference, and all documents not turned over by the IRS pursuant to that request), all documents contained on the accompanying thumb drive (Bates Labeled Miis 000001-003629; Miis FOIA Response 000001-001741, and accompanying spreadsheets), and all other documents not available at this time.

[4] Taxpayer has analyzed and summed the revenue officer's values contained in *her* handwritten physical inventory and valuation. Moreover, as reflected on Exh. dd, on August 26, 2014 the revenue officer, on the Order For Entry Data Sheet in the formal IRS records, stated that "Pictures were taken of all assets listed. Revenue Officer believes the asset[s] listed <u>are in retail sell condition</u> except the sewing & pressing machine which will sell at used sell prices." Three days later, as indicated on Exh. ee, on August 29, 2014, the revenue officer indicated that "Revenue Officer believes that <u>all of the dresses and accessories for retail sale are new and are in good condition</u>." These admissions are highly relevant in light of subsequent efforts by the IRS agents to de-value such assets, and support/justify lower values, for unlawful purposes.

[5] These, again, are the IRS's own figures and admissions.

[6] This $6,000 figure equated to a value of <u>less than $4 per dress</u> for an inventory of designer dresses that, again, the IRS described as "in retail sell condition," Exh. dd, and as "new and . . . in good condition." Exh. ee. Moreover, this $4 figure does not even take into account the substantial other inventory.

successful in auctioning off, before their very eyes, the family's entire life savings, which was bundled in the seized inventory, for pennies on the dollar. Remarkably, one of the government agents actually bid on and successfully acquired auctioned items (for below market value). The stress of these events directly caused Mii's president and founder into a quadruple bypass surgery to save his life not three months after the incident, resulting in hundreds of thousands of dollars in medical bills. And, as it turned out, the purported tax at issue *was not even owed* in the first place and the Revenue Officer in charge of the seizure was aware that the assessed balance was incorrect and due to a system error. (See, e.g., Exh. D) In fact, Mii's tax returns reflect that the 2005 tax year at issue *generated a net operating loss carryover*. Testimony from Mii's tax preparer will also establish this, as well as the fact that the IRS agent was provided with an amended Form 1120 demonstrating that no tax was owed and that they discussed this issue on multiple occasions.

4.  Mii's allegedly owed the IRS $31,422.46 for the tax years of 2005, 2008, and 2010. The vast majority was allegedly owed with respect to 2005. Its tax professional had remained in communication with the revenue officer and had filed tax returns demonstrating that the tax liabilities at issue did not exist. (See, e.g., Exh. D)

5.  On March 4, 2015, the IRS wrongfully seized inventory from Mii's that had a value of at least $615,000 based on the IRS's own physical inventory. (Exh. A) A unit of 20-plus government agents armed with firearms overtook the premises and took possession of the inventory at issue. (Mii's was run by an elderly couple, both over the age of 65, who presented no physical threat.) They presented the owners of Miis written notice on the day of the seizure and sale that the assets had been determined to have a fair market value of $10,000 and that they must provide a check for $10,000 within hours or the items would be sold. (Exh. E) This was not reasonable, in compliance with the governing regulation or an accurate or justifiable valuation.[7] Among the items wrongfully taken during the seizure was an armed services uniform hat that was owned by a Vietnam veteran who had left the hat for Miis to sew badges of honor onto it. The agents nonetheless refused to return the hat. Along with the cadre of armed agents, the revenue officer brought along four children and set them on a pallet with several boxes of pepperoni pizza during the entire process. These highly unusual circumstances demonstrate the lack of regard for the exceptional use (and misuse) of the seizure and sale provisions.

6.  *On the same day that the property was seized*, the IRS, without properly posting notice and waiting the required period of time, conducted a wrongful sale of the seized assets by conducting an auction inside of Mii's premises. The Service failed to comply with the notice requirements of Treas. Reg. § 301.6336-1(c). The Service also failed to conduct a public auction in compliance with Treas. Reg. § 301.6336-1(c). The IRS failed to comply with I.R.C. §§ 6335 and 6336. Every last piece of inventory was put into lots and sold. One of the agents bid on and purchased items. Fewer than 10 potential purchasers showed up.

---

[7] The seizing agents failed to comply with I.R.C. § 6331(d)(2)'s 30-day notice requirement; issued the levy in the name of the wrong person; and failed to comply with § 6331(d)(4)'s requirement to provide notice of the relevant provisions of the IRC relating to the levy (namely, § 6336), the procedures applicable to the levy and sale, the alternatives available to prevent levy and other requirements of § 6331(d)(4). The agents also violated, among other provisions, I.R.C. § 6331(f) and (j) by conducting an uneconomical levy (and failing to conduct an uneconomical levy analysis required by § 6331(j)) and by failing to conduct the required investigation of the property and to consider alternative collection methods.

7. The IRS intentionally, recklessly, and/or negligently valued Mii's assets at an unreasonably low price to purportedly justify using the "perishable goods" procedures/provisions in order to conduct a sale under 26 U.S.C. § 6336 and to thereby avoid the statutorily-prescribed safeguards that govern the sale of seized assets that are designed to ensure that such sales result in a fair price under the conditions. The IRS agent wrongfully classified the bridal dress inventory as "perishable goods," then liquidated these assets, which had a value of over $600,000, for roughly $17,000. Prior to the seizure, the IRS conducted an inventory of Mii's assets. (Exh. A) Pursuant to that inventory, the IRS originally determined that the value of the inventory was approximately $615,000. (*Id.*) It valued approximately 1,640 designer dresses in inventory at an aggregate value of $585,000. (*Id.*) Again, this was *the IRS's own* valuation. The IRS notated an additional 97 dresses for which it did not assign a value. These 97 dresses were labeled as "Mother of the Bride" dresses. A conservative average value for these style dresses is $300, an additional approximately $30,000 in total. Notably, the taxpayer conducted a detailed inventory several months after that inventory that supported an inventory value of approximately $579,752 for all "in style," current inventory (i.e., it did not even include older inventory). (Exh. F) The inventory value and level did not materially change between the time of that inventory and the seizure. (Exh. F) These values are supported and corroborated by the voluminous available books and records, which are provided in the enclosed thumb drive.

8. As became clear, the IRS continually sought ways to justify lowering the value of the inventory internally in order to justify circumventing the normal seizure and sale rules by using the less burdensome perishable goods procedure. Ultimately, after purportedly being quoted a cost of approximately $7,000[8] to store the inventory and to conduct a proper public auction (IRS records were deliberately falsified to nearly double the quoted cost and to falsely reflect the date such quotes were received), the revenue officer and other agents conspired to officially and conveniently value the more than 1,600 designer bridal dresses and other assets at $6,000. (That, again, equates to a value of less than $4 per dress for an inventory of designer dresses, not even accounting for the value of the other substantial inventory.) The agents believed that if the inventory was "valued" below the cost to store it, they would be sufficiently justified in using the exceptional perishable good procedure. This is, first, not the law, and second, the agents acted in bad faith in arriving at (i.e., engineering) the values. The $6,000 valuation—a far cry from the IRS's initial valuation of over $600,000—was, in other words, intentionally manufactured to get the result that the agents wanted in order to circumvent the normal seizure and sale rules.

---

[8] The $7,120 figure used by the revenue officer in her memorandum to justify seeking the perishable goods seizure was not truthful or an accurate estimate of the figures given by vendors. Compare Exh. P (reflecting "estimates" used to justify seeking procedure of $7,120 (AB Moving); $6,622 (All My Sons); and $7,902 (Kingdom Mission)) with Exh. Z (earlier contemporaneous documentation by revenue officer of estimates received from vendors, stating "I was able to secure the following information:" Total amount of $3,210 (AB Moving); Total amount of $2,461 (All My Sons); and $3,601 (Kingdom Mission)). Also note that it becomes clear, in reviewing the IRS's files, that the notes contained in Exh. P were falsely dated by the revenue officer. Compare Exh. ff, which demonstrates that two days before the seizure was to take place, the revenue officer's General Manager was concerned about using a perishable goods procedure. Also see Exh. gg (On March 2, 2015 (two days before seizure) "the seizure packet hadn't been approved yet. She called later in the day and advised seizure was <u>not</u> approved as perishable goods seizure.") As the notes on Exh. ff reflect, the revenue officer called and obtained storage figures/estimates on March 2, 2015 in response to the new concerns. Those figures—again, obtained on March 2, 2015—are nearly double those reflected in Exh. Z from the same vendors, and somehow were then inserted into records dated January 29, 2015 (See Exh. P) to cover up the lack of a justification for using the procedure. No records were produced to corroborate the figures used.

4

9.  This characterization is supported by the IRS's own internal records. Prior to the seizure, recognizing that the value of the inventory greatly exceeded the purported outstanding tax debt, the revenue officer in charge of the ultimate seizure, Ms. Darlene Coleman, in internal correspondence, made an insightful admission, stating that Mii's "entire inventory will not be seized at the end of the day" because its value greatly exceeded that necessary to satisfy the purported debt. (Exh. G) ("she has a massive amount of dresses"; "She has over several thousand of dresses..."); (Exh. H) Ms. Coleman's statement demonstrates that the IRS believed that only a portion of the inventory was needed to satisfy the alleged $31,422 tax liability. In a later email reply thread to Ms. Coleman's internal correspondence, the IRS Supervisory Revenue Officer wrote: "This is prime wedding season, so don't miss the opportunity *to shut down this failing business venture.*" (Exh. C) IRS agents made other extremely egregious statements that demonstrate the bad motives behind this seizure that led to the multiple violations of law.

10. Later, in an intentional effort to justify using the streamlined and less burdensome "perishable goods" seizure and sales procedure, the IRS subsequently devalued the inventory. On June 26, 2014, using the exact same information from the IRS's own inventory catalog as before, internal documents demonstrate that IRS agents conspired to devalue that same property to $90,000. (Exh. I, p. 2) The IRS arbitrarily decided on this valuation and did not justify the new valuation. There is absolutely no basis provided for this new valuation.

11. Later still, the IRS erroneously, arbitrarily, and in bad faith decreased the valuation once again to a range of $21,000 to $35,000 in July 2014. (Exhs. J ("the inventory's value has to be reduced by at least 70% . . . [PALS] has valued the inventory at $35,000"); K ("try and figure out what the TP paid for the item – this is more in line with FMV. My estimation is the markup is at least 50% if not more like 70% of the ticket price she listed it for sale. So this would bring FMV to more like $21,000.00 to $35,000.00.";[9] L ("[PALS] advising that the inventory's value has to be reduced by at least 70% . . . Patty has valued the inventory at $35,000. She advised that even the previous 70% reduction in value of the assets could be generous at best and should be more like 90% reduction in the value of the assets. . . .")[10] Note that the timing of this correspondence demonstrates that the IRS had already decided to perform a perishable goods sale prior to even determining/engineering an ultimate valuation or determining the cost to sell/store the inventory. The entire email thread was preceded by an email from the revenue officer indicating, "My GM is on board with doing a perishable goods sale, he says a general meeting to discuss the perishable is not necessary for him, he's good with the perishable. Also, I need the expense of sale amount." (Exh. K) This was followed by an email thread ultimately (and in an unjustified and arbitrary manner) determining a fair market value of $35,000. Moreover, this was done despite the fact that the IRS's records demonstrate that months later it still valued the assets as having an "Approximate Fair Market Value of $100,000," (Exh. M), and that the revenue officer indicated that she valued the assets at at least $70,000 to $90,000 without even considering the hundreds of dresses on racks. (Exh. N) It was also done despite the fact that the revenue officer had previously stated that she

---

[9] It is also not clear how a 70% reduction of the retail price (more than $600,000) would result in a value range of $21,000 - $35,000. In fact, the agent deliberately did not apply the 70% (later arbitrarily increased to 90%) reduction to the retail price, but instead to an arbitrary figure that was *already* nearly a 90% reduction.

[10] These percentage reductions, which were not only applied to arbitrary and incorrect figures to start with, also appear entirely inconsistent with I.R.M provisions governing the determination of a RFSV, which allow for a value reduction "not to exceed 25%" to determine the forced sale value, which may then be reduced "by a maximum of 20%" in order to determine the reduced forced sale value. I.R.M. 5.10.4.2.1.3 and 4.

"believes the asset[s] listed are in retail sell condition except the sewing and pressing machine which will sell at use sell prices" and that the "[e]quity in the business property assets [wa]s approximately $100,000," (Exh. dd), and that she "believes that all of the dresses and accessories for retail sale are new and are in good condition." (Exh. ee). (See also Exhs. A, B, reflecting values from $615,000 to over $1 million).

12. Finally, in mid-July 2014, the IRS—again, in a continued effort to invoke the perishable goods sale rule—revised its valuation of the dresses to $10,000 and then calculated (i.e., engineered) a Residual Forced Sale Value ("RFSV") of $6,000 based on "age and condition of the property" (Exhs. O, P, Q) despite the fact it subsequently admitted that the inventory was "in retail sell condition," (Exh. dd), and in "new and . . . in good condition," (Exh. ee), and that a later IRS summary memo dated September 4, 2014 still indicated that the assets had a fair market value of at least $100,000. (Exh. R, p. 3) Regardless, the agents felt they then had what they needed/wanted with the engineered $6,000 figure. The IRS used this manufactured $6,000 figure to justify using a perishable goods seizure, despite the fact that as late as March 2, 2015 (two days before seizure) it again reported that the assets had an "Approximate Fair Market Value [of] $100,000." (Exh. S, p. 3).

13. Leveraging these engineered valuations, the IRS agent took the position that the property was properly classified as perishable goods because the expense to store the property was too great in relation to the IRS's valuation of the property (even though the IRS had at one time determined that it had a retail value in excess of $615,000). (Exh. aa, "cannot be kept without great expense" selected as Perishable Goods Sale Criteria)[11] (Note that this appears contrary to the IRS internally documented justification and reasoning for the procedure: "RO Coleman and GM Joseph Roberts decided that the best possible option for resolution **where the government will benefit the most** was the Perishable Goods Sale . . ." (Exh. ff)) The IRS incorrectly valued the property at $10,000 with a RFSV of $6,000. Based on the moving and storage estimates it purportedly received, the IRS documented that it would have spent approximately $7,000 to store the inventory in order to conduct a proper sale under the normal rules. (These figures were false as well, as indicated in Exh. Z and at footnote six hereof. The cost quotes in the revenue officer's notes are approximately half of those reflected in her reports seeking a perishable goods sale.) By using the false $10,000 valuation and $6,000 RFSV, the IRS took the position that it could sell the assets through a perishable goods sale and avoid the hassle of finding storage for the inventory it seized and abiding by the Congressionally established rules. As these figures and records demonstrate, the IRS intentionally placed values on the property that purportedly allowed it to fit within, and justify, the perishable goods process. It is no coincidence that the $6,000 RFSV was $1,000 less than the purportedly estimated storage cost, which just barely "allowed" for use of the perishable goods procedure (at least, that is the position that the agents wrongly took). The agents showed disregard for the process throughout. (Exh. T "My GM is on board with doing a perishable goods sale, he says *a general meeting to discuss the perishable is not necessary for him, he's good with the perishable*.") (Compare with I.R.M. standard at 5.10.1.7: "Upon identification of a potential

---

[11] In her final memorandum in support of the perishable goods procedure, the agent gave a contradictory basis for invoking the procedure. Exh. S ("It has been determined that the expense of moving and storage would significantly diminish the remaining equity, therefore a Perishable Goods Sale would be the best option for the Service to receive proceeds necessary to full pay the tax liability.") This is an entirely different basis/prong for invoking the perishable goods procedure, and there was no justification documented in the file for this basis.

perishable goods sale, the revenue officer group manager *will* schedule a pre-seizure 4-way conference with the revenue officer, PALS group manager and PALS....") The Service simply purportedly determined that a perishable goods procedure was "the best option for the [S]ervice to receive proceeds to pay the tax liability." (Exh. U); (Exh. ff) ("RO Coleman and GM Joseph Roberts decided that the best possible option for resolution where the government will benefit the most was the Perishable Goods Sale . . .") That, however, is not the standard to invoke the perishable goods procedure under I.R.C. § 6336 ("If . . . property . . . is liable to perish or become greatly reduced in price or value by keeping, or . . . such property cannot be kept without great expense" then the IRS may potentially invoke the procedure.) The basis for invoking the perishable goods procedure is not satisfied by determining what is most beneficial to the IRS, but by satisfying, in good faith, the statutory requirements of Section 6336.

14. Had the IRS used its original, and more accurate, valuation of $615,000, it would <u>not</u> have qualified to treat the inventory as perishable goods. (Exhs. A, B) Even if the IRS had used its subsequent arbitrarily discounted valuation of $70,000 to $90,000 (or even $35,000),[12] it would <u>not</u> have qualified to treat the inventory as perishable goods, and would have been required to conduct the sale under 26 U.S.C. § 6335, which requires a 10-day period to notify potential purchasers of the sale. There was never any justification for how the IRS arrived at the $70,000-$90,000 valuation (which, again, expressly did not even account for the roughly 1,000 dresses on racks) from the $615,000 physical inventory it took. It then arbitrarily and without reasoned justification applied discounts—90%, then an additional 25%, then an additional 20%—to reach an RFSV of $6,000. The valuation was flawed, purely arbitrary, and wrongfully designed to justify a perishable goods sale.

15. Moreover, underscoring the problems with the process, even two days prior to the seizure, IRS management was backtracking and refusing to approve the sale as a perishable goods sale. Exh. gg demonstrates that on March 2, 2015, the perishable goods seizure "hadn't been approved yet" and "was not approved as [a] perishable goods seizure." Exh. ff reflects that as late as March 2, 2015, IRS management expressed concern over the use of the procedure, and "there were still questions concerning the assets." As reflected in the management signature time stamps, management did not actually sign off on the perishable goods seizure memo until after the revenue officer had submitted her affidavit and obtained a writ from the district court. (Exh. bb). Exh. bb also reflects that the descriptions and valuation methods for the inventory were significantly changed on March 2, 2015 in that seizure memo to make last-minute changes to support the agents' wrongful use of the perishable goods procedure. (Note that these descriptions were also contrary to prior representations from the revenue agent. Compare, e.g., Exhs. dd, ee.)

16. The Service bears the burden to prove by a preponderance of the evidence that the determination to sell the seized property using the perishable goods procedure met the statutory standards of section 6336. *See Galusha v. Commissioner*, 95 T.C. 218, 223 (1990). The property at issue clearly did not come within the meaning of perishable. *Id.* There is no plausible basis for determining that an inventory of some 1,600 wedding dresses is subject to quickly deteriorate, spoil, rot, or otherwise perish. *See id.* Nor can the property be said to be subject to—or, *likely*

---

[12] Note that there is no justification whatsoever in the record for arbitrarily coming to this discounted value of $70,000 to $90,000. It was completely unjustified and arbitrary. Nonetheless, the IRS began discounting *from this figure*, rendering all of its subsequent calculations unjustified and arbitrary or intentionally misleading.

to—become greatly reduced in price or value if not sold immediately or pursuant to the normal rules of the sale of seized items. *Id.* ("The courts have interpreted the language 'liable to become greatly reduced in value' to mean 'likely' to become greatly reduced in value.") There is no evidence to support such a conclusion (nor was this the justification used for the IRS's action), and the inventory at issue, which could be sold many years after acquisition, was clearly not subject to become greatly reduced in price or value if not sold immediately or in accordance with the normal IRC section 6335 sale time frames. Internal Revenue Manual 5.10.1.6 ("The loss of value must be rapid in relation to the time it would take to hold the sale under normal IRC section 6335 sale time frames.") Finally, the Service failed to establish that the inventory could not be kept without great expense within the meaning of Section 6336. *See Galusha.* The Service failed to obtain an appraisal of the value of the inventory or any reasoned and supportable valuation or appraisal of the inventory, and the only credible/reliable evidence in the record to establish its value demonstrates that it had a value of over $600,000. Admissions by the revenue officer and agents indicate that the value was over $600,000 and no less than approximately $100,000. The expected costs for a section 6335 sale were approximately $3,000. The Service would not have incurred a great expense to abide by the statutorily prescribed rules for the sale of such seized items. It simply did not satisfy this prong of Section 6336, and it is the Service's burden to do so.   I.R.M. 5.10.1.6 ("A determination must be made to balance the cost of maintaining the assets, such as moving and storage costs, against the net amount expected from a sale conducted under the normal IRC section 6335 sale provisions."); I.R.M. 5.10.1.7 ("[T]he *Perishable Goods Criteria and Sale Plan* must include an asset valuation for the comparison of an IRC 6335 versus an IRC 6336 sale.")

17. As demonstrated by the foregoing, the IRS intentionally, recklessly, and/or negligently violated the IRC and Regulations to harm Mii's and its owners.

18. Moreover, the IRS operated outside the scope of the Order for Entry on Premises to Effect Levy by seizing and selling property that did not belong to Mii's. The Order for Entry described the property to be seized as including "wedding dresses, bridesmaid dresses, prom dresses, shoes, bridal, veils, pillows, miscellaneous furniture, cash register, sewing machine and a pressing machine." (Exh. V) During the seizure, in addition to the more than $615,000 worth of wedding dresses and related inventory, the following property was seized and sold by the IRS: Keuring K40 Elite and K-cup carousel; Onkyo HT53500(B) surround sound music system; HPM 476DN Laser Jet Multi Functional printer; Nintendo Wii Mario Kart 8 Deluxe set; XBOX 1 Assassin Creed Unity Bundle; Sony PlayStation 4, 2 game bundle Grand Theft Auto 5 & The Last of Us, serial number MB319365746, 500GB; 13 in 1 Combo Game Table; and LG 65 inch Ultra HD TV, serial #410RMXX2S730, model 65UB9500.  (Exh. W) None of these items fall into the scope of the authorized seizure of property and none were ever justified for perishable goods treatment. Indeed some of the items were not even the property of Mii's. The majority of the prior listed property was owned by the son of Mii's owners and the IRS agents were informed of and aware of this at the time they seized the assets.

19. Notably, one of the seizing agents purchased assets at the auction.  The agent purchased a Nintendo Wii and Mario Kart 8. The agents then took steps to hide this by falsely certifying that Refresh Bridal, LLC purchased the items. (See Exh. X, indicating payment of $10,500 by Refresh Bridal, LLC, and Exh. Y, indicating sale amount of $10,650 to Refresh Bridal by including $150 for Nintendo Wii purchased by agent.  The agents attempted to credit Refresh Bridal, LLC with

the $150 purchase of the Nintendo Wii and Mario Kart 8 to hide the fact that it was actually purchased by a seizing agent.) Also note that one of the listed bidders, Steven Jedlowski, was a Dallas police officer who is believed to have been one of the seizing agents. Steven Jedlowsi wrongfully purchased a Sony Playstation 4 and game bundle for less than fair market value. He is listed as purchasing Item No. 26. (See Miis FOIA Response 001532; 001537; 001540)

20. The IRS intentionally, recklessly, and/or negligently seized all the inventory and items, undervalued the inventory and items in order to hold a perishable goods sale, and sold the inventory at an extremely discounted rate without complying with the normal seizure and sale rules (e.g., under § 6335 and the regulations thereunder) in an effort to put Mii's out of business.

Damages

21. Taxpayer has suffered economic damages due to the IRS's intentional, reckless, or negligent collections and illegal sale of the seized goods. Taxpayer hereby seeks damages in the amount of $1,000,000. Taxpayer also seeks recovery of all costs provided under § 7433 or by other law, including § 7430.

22. Taxpayer seeks $1,000,000 in economic damages for the wrongful acts with respect to Miis inventory. The IRS's wrongful actions described above caused Taxpayer's interest in Mii's (e.g., Taxpayer's stock interest) to decrease in value by more than $1,000,000.

23. Finally, Taxpayer seeks damages of $300,000 for emotional distress and economic damages that resulted from health complications caused by the unlawful actions of the IRS. Mii's president, Tony Thangsongcharoen, suffered a heart attack requiring quadruple bypass surgery as a result of his experience from the unlawful seizure and sale of all of Mii's inventory. This resulted in medical bills in excess of $300,000. This medical condition also resulted in the inability of Mr. Thangsongcharoen to operate Mii's. Mii's lost Mr. Thangsongcharoen, its head executive, for a significant period of time because he was unfit to lead Plaintiff into recovery from the harm caused by the illegal sale. Mii's was never able to recover.

24. Under 26 U.S.C. § 7433, Taxpayer is entitled to direct economic damages from the IRS in the amount of $1,000,000 because the actual, direct economic damages exceed $1,000,000.

Jason B. Freeman

Tony ("Thawatchai") Thangsongcharoen

9

Somnuek Thangsongcharoen

10



2595 DALLAS PARKWAY, SUITE 420 · FRISCO, TX 75034
PHONE (214) 984-3410 · TOLL FREE (855) 676-1040 · FAX (214) 984-3409
WWW.FREEMANLAW-PLLC.COM

Jason B. Freeman                                   Jason@FreemanLaw-pllc.com
Managing Member

February 26, 2017

Via Certified Mail Return Receipt Requested: 7016 2710 0000 3084 1462

and Fax: (877) 477-9223

IRS Advisory Group
1100 Commerce St.
Mail Code 5028 DAL
Dallas, Texas 75242

Attn: Compliance Technical Support Manager
Area Director
Internal Revenue Service
1100 Commerce St.
Dallas, TX 75242

RE:     Tony ("Thawatchai") Thangsongcharoen and Somnuck Thangsongcharoen
        ("Taxpayer" or "Taxpayers")
        SSN: ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ respectively
        Supplemental Request for Relief from Unlawful Collection Pursuant to 26 U.S.C.
        § 7433, 26 U.S.C. § 7426, Regulation § 301.7433-1

        We hereby request relief pursuant to 26 U.S.C. §§ 7433 and 7426 and the
regulations thereunder as set forth in the enclosed Supplemental Administrative Claim for
Relief, which is being submitted in supplement to the taxpayers' February 7, 2017 claim.

                                Sincerely,

                                Jason B. Freeman

**Supplemental Administrative Claim for Relief Pursuant to 26 U.S.C. §§ 7433, 7426**

Via Certified Mail Return Receipt Requested: 7016 2710 0000 3084 1462
and Fax: (877) 477-9223

IRS Advisory Group
1100 Commerce St.
Mail Code 5028 DAL
Dallas, Texas 75242

Attn: Compliance Technical Support Manager
Area Director
Internal Revenue Service
1100 Commerce St.
Dallas, TX 75242

RE:   Tony ("Thawatchai") Thangsongcharoen and Somnuek Thangsongcharoen
("Taxpayer" or "Taxpayers")[1]
SSN: ▮▮▮▮▮and ▮▮▮▮▮respectively
Request for Relief from Unlawful Collection Pursuant to 26 U.S.C. § 7433, 26
U.S.C. § 7426, Regulation § 301.7433-1

Dear Sir or Madam:

Pursuant to 26 U.S.C. §§ 7433 and 7426, Taxpayers hereby request that relief in the form of damages described below be granted related to the unlawful collection actions that occurred on March 4, 2015 (and all actions related thereto) as a result of the reckless, intentional, and/or negligent disregard of the Internal Revenue Code and governing Regulations.[2]

Statement of Taxpayer Identification

1.   Tony Thangsongcharoen's Tax Identification Number is ◀▮▮▮▮▮       Somnuek Thangsongcharoen's Tax Identification Number is ▮▮▮▮▮Tony Thangsongcharoen and Somnuek Thangsongcharoen are collectively referred to herein as Taxpayer. The taxpayer's current address is 2110 Meadow Glen Dr., Garland, TX 75044. The taxpayer's current home and work phone number is (214) 517-4754. For current contact purposes, Taxpayer is currently using the phone number and address of their attorney: The mailing address is 2595 Dallas Parkway, Suite 420, Frisco, TX 75034, and the telephone number is (214) 984-3410. Taxpayer can be contacted between 8:00 AM and 5:00 PM any day of the week.

---

[1] This claim is related to an administrative claim submitted on behalf of Tony & Mii's, Inc. (TIN ▮▮▮▮▮. While correspondence from the IRS refers to Tony & Mii's, Inc. as Mii's Inc. d/b/a Mii's Bridal Salon, its legal name is Tony and Mii's, Inc. For sake of clarity, however, such entity will be referred to as Mii's or Mii's Inc. herein.
[2] This administrative claim is being filed with the above-listed addressee/address pursuant to Notice 2010-53 and IRS Publication 4235. It is also addressed according to Treas. Reg. 301.7433-1 (i.e., addressed to the Area Director attention of the Compliance Technical Support Manager). Although such latter procedure has been superseded by the requirements of Notice 2010-53, and the referenced position has been abolished, Treas. Reg. § 301.7433-1 has not been withdrawn or amended.

1

Statement of Claim[3]

2.   This is an administrative claim against the Internal Revenue Service ("IRS") for unlawfully seizing, collecting, and selling Mii's property and for the resulting damages pursuant to 26 U.S.C. § 7433(b) and § 7426 and such other amounts as in law and fact are suffered, and recoverable, by Taxpayers. IRS agents, through intentional, reckless, and/or negligent disregard of the provisions of the Internal Revenue Code ("IRC") and Regulations, caused damages to Taxpayer's due to their unlawful seizure, collection, and sale of assets of Mii's, an entity owned by Taxpayers and whose value decreased substantially as a result of the unlawful actions thereby causing damages to Taxpayers. The assets at issue—over 1,600 designer bridal gowns and a large amount of related wear—had a value of over $615,000. The taxpayers here had an interest in such property. The IRS had conducted a physical inventory supporting a value in excess of $600,000 prior to the seizure. (Exh. A)[4] (*See also* Exh. B - The values provided by the revenue officer on Exh. B, dated January 29, 2015, reflect that the inventory had a lowest possible value of $365,000 and an estimated potential value in excess of $1,000,000.)[5] Nonetheless, the IRS classified the designer bridal gowns as "perishable goods" and instituted a seizure under the guise of a "Perishable Goods" procedure, taking the position that the bridal gowns were perishable goods for such purposes and conducting a sale of the seized assets within four hours of their seizure. One of the seizing agents purchased seized assets.

3.   After initially valuing the assets at over $600,000, the IRS agent took steps to deliberately justify de-valuing the assets, which included more than 1,600 designer bridal dresses, to $6,000 for internal purposes—a figure that the agents believed was just below the value necessary to purportedly "justify" invoking the perishable goods procedure (and thereby circumvent the normal seizure and sale rules).[6] The seizure and sale resulted in the seizure of more than $615,000 of assets and their sale *on the same day* for about $17,000. The seizure was conducted in bad faith, as summarized through correspondence among the agents documented in the administrative file—for example, the following directive from the IRS Supervisory Revenue Officer: "don't miss the opportunity *to shut down this failing business venture*." (Exh. C, referring to the perishable goods

---

[3] In support of its claim, Taxpayer relies upon all documents referenced as exhibits in the claim submitted on February 7, 2017, as well as all documents in the IRS's administrative file (including all documents received pursuant to Mii's FOIA request, which is hereby incorporated by reference, and all documents not turned over by the IRS pursuant to that request), all documents contained on the thumb drive previously submitted with the original February 7 claim (Bates Labeled Miis 000001-003629; Miis FOIA Response 000001-001741, and accompanying spreadsheets), and all other documents not available at this time.

[4] Taxpayer has analyzed and summed the revenue officer's values contained in *her* handwritten physical inventory and valuation. Moreover, as reflected on Exh. dd, on August 26, 2014 the revenue officer, on the Order For Entry Data Sheet in the formal IRS records, stated that "Pictures were taken of all assets listed. Revenue Officer believes the asset[s] listed are in retail sell condition except the sewing & pressing machine which will sell at used sell prices." Three days later, as indicated on Exh. ee, on August 29, 2014, the revenue officer indicated that "Revenue Officer believes that all of the dresses and accessories for retail sale are new and are in good condition." These admissions are highly relevant in light of subsequent efforts by the IRS agents to de-value such assets, and support/justify lower values, for unlawful purposes.

[5] These, again, are the IRS's own figures and admissions.

[6] This $6,000 figure equated to a value of less than $4 per dress for an inventory of designer dresses that, again, the IRS described as "in retail sell condition," Exh. dd, and as "new and . . . in good condition." Exh. ee. Moreover, this $4 figure does not even take into account the substantial other inventory.

seizure) The IRS was, unfortunately, successful in shutting down this business—a business that was founded, built, and run by a law-abiding, tax-paying immigrant family from Thailand. It was successful in auctioning off, before their very eyes, the family's entire life savings, which was bundled in the seized inventory, for pennies on the dollar. Remarkably, one of the government agents actually bid on and successfully acquired auctioned items (for below market value). The stress of these events directly caused Mii's president and founder into a quadruple bypass surgery to save his life not three months after the incident, resulting in hundreds of thousands of dollars in medical bills. And, as it turned out, the purported tax at issue *was not even owed* in the first place and the Revenue Officer in charge of the seizure was aware that the assessed balance was incorrect and due to a system error. (See, e.g., Exh. D) In fact, Mii's tax returns reflect that the 2005 tax year at issue *generated a net operating loss carryover*. Testimony from Mii's tax preparer will also establish this, as well as the fact that the IRS agent was provided with an amended Form 1120 demonstrating that no tax was owed and that they discussed this issue on multiple occasions.

4. Mii's allegedly owed the IRS $31,422.46 for the tax years of 2005, 2008, and 2010. The vast majority was allegedly owed with respect to 2005. Its tax professional had remained in communication with the revenue officer and had filed tax returns demonstrating that the tax liabilities at issue did not exist. (See, e.g., Exh. D)

5. On March 4, 2015, the IRS wrongfully seized inventory from Mii's that had a value of at least $615,000 based on the IRS's own physical inventory. (Exh. A) A unit of 20-plus government agents armed with firearms overtook the premises and took possession of the inventory at issue. (Mii's was run by an elderly couple, both over the age of 65, who presented no physical threat.) They presented the owners of Miis written notice on the day of the seizure and sale that the assets had been determined to have a fair market value of $10,000 and that they must provide a check for $10,000 within hours or the items would be sold. (Exh. E) This was not reasonable, in compliance with the governing regulation or an accurate or justifiable valuation.[7] Among the items wrongfully taken during the seizure was an armed services uniform hat that was owned by a Vietnam veteran who had left the hat for Miis to sew badges of honor onto it. The agents nonetheless refused to return the hat. Along with the cadre of armed agents, the revenue officer brought along four children and set them on a pallet with several boxes of pepperoni pizza during the entire process. These highly unusual circumstances demonstrate the lack of regard for the exceptional use (and misuse) of the seizure and sale provisions.

6. *On the same day that the property was seized,* the IRS, without properly posting notice and waiting the required period of time, conducted a wrongful sale of the seized assets by conducting an auction inside of Mii's premises. The Service failed to comply with the notice requirements of Treas. Reg. § 301.6336-1(c). The Service also failed to conduct a public auction in compliance with Treas. Reg. § 301.6336-1(c). The IRS failed to comply with I.R.C. §§ 6335 and 6336. Every

---

[7] The seizing agents failed to comply with I.R.C. § 6331(d)(2)'s 30-day notice requirement; issued the levy in the name of the wrong person; and failed to comply with § 6331(d)(4)'s requirement to provide notice of the relevant provisions of the IRC relating to the levy (namely, § 6336), the procedures applicable to the levy and sale, the alternatives available to prevent levy and other requirements of § 6331(d)(4). The agents also violated, among other provisions, I.R.C. § 6331(f) and (j) by conducting an uneconomical levy (and failing to conduct an uneconomical levy analysis required by § 6331(j)) and by failing to conduct the required investigation of the property and to consider alternative collection methods.

3

last piece of inventory was put into lots and sold. One of the agents bid on and purchased items. Fewer than 10 potential purchasers showed up.

7.  The IRS intentionally, recklessly, and/or negligently valued Mii's assets at an unreasonably low price to purportedly justify using the "perishable goods" procedures/provisions in order to conduct a sale under 26 U.S.C. § 6336 and to thereby avoid the statutorily-prescribed safeguards that govern the sale of seized assets that are designed to ensure that such sales result in a fair price under the conditions. The IRS agent wrongfully classified the bridal dress inventory as "perishable goods," then liquidated these assets, which had a value of over $600,000, for roughly $17,000. Prior to the seizure, the IRS conducted an inventory of Mii's assets. (Exh. A) Pursuant to that inventory, the IRS originally determined that the value of the inventory was approximately $615,000. (*Id.*) It valued approximately 1,640 designer dresses in inventory at an aggregate value of $585,000. (*Id.*) Again, this was *the IRS's own* valuation. The IRS notated an additional 97 dresses for which it did not assign a value. These 97 dresses were labeled as "Mother of the Bride" dresses. A conservative average value for these style dresses is $300, an additional approximately $30,000 in total. Notably, the taxpayer conducted a detailed inventory several months after that inventory that supported an inventory value of approximately $579,752 for all "in style," current inventory (i.e., it did not even include older inventory). (Exh. F) The inventory value and level did not materially change between the time of that inventory and the seizure. (Exh. F) These values are supported and corroborated by the voluminous available books and records, which are provided in the enclosed thumb drive.

8.  As became clear, the IRS continually sought ways to justify lowering the value of the inventory internally in order to justify circumventing the normal seizure and sale rules by using the less burdensome perishable goods procedure. Ultimately, after purportedly being quoted a cost of approximately $7,000[8] to store the inventory and to conduct a proper public auction (IRS records were deliberately falsified to nearly double the quoted cost and to falsely reflect the date such quotes were received), the revenue officer and other agents conspired to officially and conveniently value the more than 1,600 designer bridal dresses and other assets at $6,000. (That, again, equates to a value of less than $4 per dress for an inventory of designer dresses, not even accounting for the value of the other substantial inventory.) The agents believed that if the inventory was "valued" below the cost to store it, they would be sufficiently justified in using the exceptional perishable good procedure. This is, first, not the law, and second, the agents acted in bad faith in arriving at (i.e., engineering) the values. The $6,000 valuation—a far cry from the

---

[8] The $7,120 figure used by the revenue officer in her memorandum to justify seeking the perishable goods seizure was not truthful or an accurate estimate of the figures given by vendors. Compare Exh. P (reflecting "estimates" used to justify seeking procedure of $7,120 (AB Moving); $6,622 (All My Sons); and $7,902 (Kingdom Mission)) with Exh. Z (earlier contemporaneous documentation by revenue officer of estimates received from vendors, stating "I was able to secure the following information:" Total amount of $3,210 (AB Moving); Total amount of $2,461 (All My Sons); and $3,601 (Kingdom Mission)). Also note that it becomes clear, in reviewing the IRS's files, that the notes contained in Exh. P were falsely dated by the revenue officer. Compare Exh. ff, which demonstrates that two days before the seizure was to take place, the revenue officer's General Manager was concerned about using a perishable goods procedure. Also see Exh. gg (On March 2, 2015 (two days before seizure) "the seizure packet hadn't been approved yet. She called later in the day and advised seizure was *not* approved as perishable goods seizure.") The notes on Exh. ff reflect, the revenue officer called and obtained storage figures/estimates on March 2, 2015 in response to the new concerns. Those figures—again, obtained on March 2, 2015—are nearly double those reflected in Exh. Z from the same vendors, and somehow were then inserted into records dated January 29, 2015 (See Exh. P) to cover up the lack of a justification for using the procedure. No records were produced to corroborate the figures used.

IRS's initial valuation of over $600,000—was, in other words, intentionally manufactured to get the result that the agents wanted in order to circumvent the normal seizure and sale rules.

9. This characterization is supported by the IRS's own internal records. Prior to the seizure, recognizing that the value of the inventory greatly exceeded the purported outstanding tax debt, the revenue officer in charge of the ultimate seizure, Ms. Darlene Coleman, in internal correspondence, made an insightful admission, stating that Mii's "entire inventory will not be seized at the end of the day" because its value greatly exceeded that necessary to satisfy the purported debt. (Exh. G) ("she has a massive amount of dresses"; "She has over several thousand of dresses..."); (Exh. H) Ms. Coleman's statement demonstrates that the IRS believed that only a portion of the inventory was needed to satisfy the alleged $31,422 tax liability. In a later email reply thread to Ms. Coleman's internal correspondence, the IRS Supervisory Revenue Officer wrote: "This is prime wedding season, so don't miss the opportunity *to shut down this failing business venture.*" (Exh. C) IRS agents made other extremely egregious statements that demonstrate the bad motives behind this seizure that led to the multiple violations of law.

10. Later, in an intentional effort to justify using the streamlined and less burdensome "perishable goods" seizure and sales procedure, the IRS subsequently devalued the inventory. On June 26, 2014, using the exact same information from the IRS's own inventory catalog as before, internal documents demonstrate that IRS agents conspired to devalue that same property to $90,000. (Exh. I, p. 2) The IRS arbitrarily decided on this valuation and did not justify the new valuation. There is absolutely no basis provided for this new valuation.

11. Later still, the IRS erroneously, arbitrarily, and in bad faith decreased the valuation once again to a range of $21,000 to $35,000 in July 2014. (Exhs. J ("the inventory's value has to be reduced by at least 70% . . . [PALS] has valued the inventory at $35,000"); K ("try and figure out what the TP paid for the item – this is more in line with FMV. My estimation is the markup is at least 50% if not more like 70% of the ticket price she listed it for sale. So this would bring FMV to more like $21,000.00 to $35,000.00.";[9] L ("[PALS] advising that the inventory's value has to be reduced by at least 70% . . . Patty has valued the inventory at $35,000. She advised that even the previous 70% reduction in value of the assets could be generous at best and should be more like 90% reduction in the value of the assets. . . ."))[10] Note that the timing of this correspondence demonstrates that the IRS had already decided to perform a perishable goods sale prior to even determining/engineering an ultimate valuation or determining the cost to sell/store the inventory. The entire email thread was preceded by an email from the revenue officer indicating, "My GM is on board with doing a perishable goods sale, he says a general meeting to discuss the perishable is not necessary for him, he's good with the perishable. Also, I need the expense of sale amount." (Exh. K) This was followed by an email thread ultimately (and in an unjustified and arbitrary manner) determining a fair market value of $35,000. Moreover, this was done despite the fact that the IRS's records demonstrate that months later it still valued the assets as having an "Approximate

---

[9] It is also not clear how a 70% reduction of the retail price (more than $600,000) would result in a value range of $21,000 - $35,000. In fact, the agent deliberately did not apply the 70% (later arbitrarily increased to 90%) reduction to the retail price, but instead to an arbitrary figure that was *already* nearly a 90% reduction.

[10] These percentage reductions, which were not only applied to arbitrary and incorrect figures to start with, also appear entirely inconsistent with I.R.M provisions governing the determination of a RFSV, which allow for a value reduction "not to exceed 25%" to determine the forced sale value, which may then be reduced "by a maximum of 20%" in order to determine the reduced forced sale value. I.R.M. 5.10.4.2.1.3 and 4.

Fair Market Value of $100,000," (Exh. M), and that the revenue officer indicated that she valued the assets at at least $70,000 to $90,000 without even considering the hundreds of dresses on racks. (Exh. N) It was also done despite the fact that the revenue officer had previously stated that she "believes the asset[s] listed are in retail sell condition except the sewing and pressing machine which will sell at use sell prices" and that the "[e]quity in the business property assets [wa]s approximately $100,000," (Exh. dd), and that she "believes that all of the dresses and accessories for retail sale are new and are in good condition." (Exh. ee). (See also Exhs. A, B, reflecting values from $615,000 to over $1 million).

12. Finally, in mid-July 2014, the IRS—again, in a continued effort to invoke the perishable goods sale rule—revised its valuation of the dresses to $10,000 and then calculated (i.e., engineered) a Residual Forced Sale Value ("RFSV") of $6,000 based on "age and condition of the property" (Exhs. O, P, Q) despite the fact it subsequently admitted that the inventory was "in retail sell condition," (Exh. dd), and in "new and . . . in good condition," (Exh. ee), and that a later IRS summary memo dated September 4, 2014 still indicated that the assets had a fair market value of at least $100,000. (Exh. R, p. 3)  Regardless, the agents felt they then had what they needed/wanted with the engineered $6,000 figure. The IRS used this manufactured $6,000 figure to justify using a perishable goods seizure, despite the fact that as late as March 2, 2015 (two days before seizure) it again reported that the assets had an "Approximate Fair Market Value [of] $100,000." (Exh. S, p. 3).

13. Leveraging these engineered valuations, the IRS agent took the position that the property was properly classified as perishable goods because the expense to store the property was too great in relation to the IRS's valuation of the property (even though the IRS had at one time determined that it had a retail value in excess of $615,000). (Exh. aa, "cannot be kept without great expense" selected as Perishable Goods Sale Criteria)[11] (Note that this appears contrary to the IRS internally documented justification and reasoning for the procedure: "RO Coleman and GM Joseph Roberts decided that the best possible option for resolution where the government will benefit the most was the Perishable Goods Sale . . ." (Exh. ff)) The IRS incorrectly valued the property at $10,000 with a RFSV of $6,000. Based on the moving and storage estimates it purportedly received, the IRS documented that it would have spent approximately $7,000 to store the inventory in order to conduct a proper sale under the normal rules. (These figures were false as well, as indicated in Exh. Z and at footnote six hereof. The cost quotes in the revenue officer's notes are approximately half of those reflected in her reports seeking a perishable goods sale.) By using the false $10,000 valuation and $6,000 RFSV, the IRS took the position that it could sell the assets through a perishable goods sale and avoid the hassle of finding storage for the inventory it seized and abiding by the Congressionally established rules. As these figures and records demonstrate, the IRS intentionally placed values on the property that purportedly allowed it to fit within, and justify, the perishable goods process. It is no coincidence that the $6,000 RFSV was $1,000 less than the purportedly estimated storage cost, which just barely "allowed" for use of the perishable goods procedure (at least, that is the position that the agents wrongly took). The agents showed disregard

---

[11] In her final memorandum in support of the perishable goods procedure, the agent gave a contradictory basis for invoking the procedure. Exh. S ("It has been determined that the expense of moving and storage would significantly diminish the remaining equity, therefore a Perishable Goods Sale would be the best option for the Service to receive proceeds necessary to full pay the tax liability.") This is an entirely different basis/prong for invoking the perishable goods procedure, and there was no justification documented in the file for this basis.

for the process throughout. (Exh. T "My GM is on board with doing a perishable goods sale, he says *a general meeting to discuss the perishable is not necessary for him, he's good with the perishable*.") (Compare with I.R.M. standard at 5.10.1.7: "Upon identification of a potential perishable goods sale, the revenue officer group manager *will* schedule a pre-seizure 4-way conference with the revenue officer, PALS group manager and PALS....") The Service simply purportedly determined that a perishable goods procedure was "the best option for the [S]ervice to receive proceeds to pay the tax liability." (Exh. U); (Exh. ff) ("RO Coleman and GM Joseph Roberts decided that the best possible option for resolution where the government will benefit the most was the Perishable Goods Sale . . .") That, however, is not the standard to invoke the perishable goods procedure under I.R.C. § 6336 ("If . . . property . . . is liable to perish or become greatly reduced in price or value by keeping, or . . . such property cannot be kept without great expense" then the IRS may potentially invoke the procedure.) The basis for invoking the perishable goods procedure is not satisfied by determining what is most beneficial to the IRS, but by satisfying, in good faith, the statutory requirements of Section 6336.

14. Had the IRS used its original, and more accurate, valuation of $615,000, it would not have qualified to treat the inventory as perishable goods. (Exhs. A, B) Even if the IRS had used its subsequent arbitrarily discounted valuation of $70,000 to $90,000 (or even $35,000),[12] it would not have qualified to treat the inventory as perishable goods, and would have been required to conduct the sale under 26 U.S.C. § 6335, which requires a 10-day period to notify potential purchasers of the sale. There was never any justification for how the IRS arrived at the $70,000-$90,000 valuation (which, again, expressly did not even account for the roughly 1,000 dresses on racks) from the $615,000 physical inventory it took. It then arbitrarily and without reasoned justification applied discounts—90%, then an additional 25%, then an additional 20%—to reach an RFSV of $6,000. The valuation was flawed, purely arbitrary, and wrongfully designed to justify a perishable goods sale.

15. Moreover, underscoring the problems with the process, even two days prior to the seizure, IRS management was backtracking and refusing to approve the sale as a perishable goods sale. Exh. gg demonstrates that on March 2, 2015, the perishable goods seizure "hadn't been approved yet" and "was not approved as [a] perishable goods seizure." Exh. ff reflects that as late as March 2, 2015, IRS management expressed concern over the use of the procedure, and "there were still questions concerning the assets." As reflected in the management signature time stamps, management did not actually sign off on the perishable goods seizure memo until after the revenue officer had submitted her affidavit and obtained a writ from the district court. (Exh. bb). Exh. bb also reflects that the descriptions and valuation methods for the inventory were significantly changed on March 2, 2015 in that seizure memo to make last-minute changes to support the agents' wrongful use of the perishable goods procedure. (Note that these descriptions were also contrary to prior representations from the revenue agent. Compare, e.g., Exhs. dd, ee.)

16. The Service bears the burden to prove by a preponderance of the evidence that the determination to sell the seized property using the perishable goods procedure met the statutory standards of section 6336. *See Galusha v. Commissioner*, 95 T.C. 218, 223 (1990). The property

---

[12] Note that there is no justification whatsoever in the record for arbitrarily coming to this discounted value of $70,000 to $90,000. It was completely unjustified and arbitrary. Nonetheless, the IRS began discounting *from this figure*, rendering all of its subsequent calculations unjustified and arbitrary or intentionally misleading.

at issue clearly did not come within the meaning of perishable. *Id.* There is no plausible basis for determining that an inventory of some 1,600 wedding dresses is subject to quickly deteriorate, spoil, rot, or otherwise perish. *See id.* Nor can the property be said to be subject to—or, *likely to*—become greatly reduced in price or value if not sold immediately or pursuant to the normal rules of the sale of seized items. *Id.* ("The courts have interpreted the language 'liable to become greatly reduced in value' to mean 'likely' to become greatly reduced in value.") There is no evidence to support such a conclusion (nor was this the justification used for the IRS's action), and the inventory at issue, which could be sold many years after acquisition, was clearly not subject to become greatly reduced in price or value if not sold immediately or in accordance with the normal IRC section 6335 sale time frames. Internal Revenue Manual 5.10.1.6 ("The loss of value must be rapid in relation to the time it would take to hold the sale under normal IRC section 6335 sale time frames.") Finally, the Service failed to establish that the inventory could not be kept without great expense within the meaning of Section 6336. *See Galusha.* The Service failed to obtain an appraisal of the value of the inventory or any reasoned and supportable valuation or appraisal of the inventory, and the only credible/reliable evidence in the record to establish its value demonstrates that it had a value of over $600,000. Admissions by the revenue officer and agents indicate that the value was over $600,000 and no less than approximately $100,000. The expected costs for a section 6335 sale were approximately $3,000. The Service would not have incurred a great expense to abide by the statutorily prescribed rules for the sale of such seized items. It simply did not satisfy this prong of Section 6336, and it is the Service's burden to do so. I.R.M. 5.10.1.6 ("A determination must be made to balance the cost of maintaining the assets, such as moving and storage costs, against the net amount expected from a sale conducted under the normal IRC section 6335 sale provisions."); I.R.M. 5.10.1.7 ("[T]he *Perishable Goods Criteria and Sale Plan* must include an asset valuation for the comparison of an IRC 6335 versus an IRC 6336 sale.")

17. As demonstrated by the foregoing, the IRS intentionally, recklessly, and/or negligently violated the IRC and Regulations to harm Mii's and its owners.

18. Moreover, the IRS operated outside the scope of the Order for Entry on Premises to Effect Levy by seizing and selling property that did not belong to Mii's. The Order for Entry described the property to be seized as including "wedding dresses, bridesmaid dresses, prom dresses, shoes, bridal, veils, pillows, miscellaneous furniture, cash register, sewing machine and a pressing machine." (Exh. V) During the seizure, in addition to the more than $615,000 worth of wedding dresses and related inventory, the following property was seized and sold by the IRS: Keuring K40 Elite and K-cup carousel; Onkyo HT53500(B) surround sound music system; HPM 476DN Laser Jet Multi Functional printer; Nintendo Wii Mario Kart 8 Deluxe set; XBOX 1 Assassin Creed Unity Bundle; Sony PlayStation 4, 2 game bundle Grand Theft Auto 5 & The Last of Us, serial number MB319365746, 500GB; 13 in 1 Combo Game Table; and LG 65 inch Ultra HD TV, serial #410RMXX2S730, model 65UB9500. (Exh. W) None of these items fall into the scope of the authorized seizure of property and none were ever justified for perishable goods treatment. Indeed some of the items were not even the property of Mii's. The majority of the prior listed property was owned by the son of Mii's owners and the IRS agents were informed of and aware of this at the time they seized the assets.

19. Notably, one of the seizing agents purchased assets at the auction. The agent purchased a Nintendo Wii and Mario Kart 8. The agents then took steps to hide this by falsely certifying that

Refresh Bridal, LLC purchased the items. (See Exh. X, indicating payment of $10,500 by Refresh Bridal, LLC, and Exh. Y, indicating sale amount of $10,650 to Refresh Bridal by including $150 for Nintendo Wii purchased by agent. The agents attempted to credit Refresh Bridal, LLC with the $150 purchase of the Nintendo Wii and Mario Kart 8 to hide the fact that it was actually purchased by a seizing agent.) Also note that one of the listed bidders, Steven Jedlowski, was a Dallas police officer who is believed to have been one of the seizing agents. Steven Jedlowsi wrongfully purchased a Sony Playstation 4 and game bundle for less than fair market value. He is listed as purchasing Item No. 26. (See Miis FOIA Response 001532; 001537; 001540)

20. The IRS intentionally, recklessly, and/or negligently seized all the inventory and items, undervalued the inventory and items in order to hold a perishable goods sale, and sold the inventory at an extremely discounted rate without complying with the normal seizure and sale rules (e.g., under § 6335 and the regulations thereunder) in an effort to put Mii's out of business.

Damages

21. Taxpayer has suffered economic damages due to the IRS's intentional, reckless, or negligent collections and illegal sale of the seized goods. Taxpayer hereby seeks damages in the amount of $1,000,000. Taxpayer also seeks recovery of all costs provided under § 7433, §7426 or by other law, including § 7430.

22. Taxpayer seeks $1,000,000 in economic damages for the wrongful acts with respect to Miis inventory. The IRS's wrongful actions described above caused Taxpayer's interest in Mii's (e.g., Taxpayer's stock interest) to decrease in value by more than $1,000,000.

23. Finally, Taxpayer seeks damages of $300,000 for emotional distress and economic damages that resulted from health complications caused by the unlawful actions of the IRS. Mii's president, Tony Thangsongcharoen, suffered a heart attack requiring quadruple bypass surgery as a result of his experience from the unlawful seizure and sale of all of Mii's inventory. This resulted in medical bills in excess of $300,000. This medical condition also resulted in the inability of Mr. Thangsongcharoen to operate Mii's. Mii's lost Mr. Thangsongcharoen, its head executive, for a significant period of time because he was unfit to lead Plaintiff into recovery from the harm caused by the illegal sale. Mii's was never able to recover.

24. Under 26 U.S.C. §§ 7433 and 7426, Taxpayer is entitled to direct economic damages from the IRS in the amount of $1,000,000 because the actual, direct economic damages exceed $1,000,000.

Jason B. Freeman

9